AO 106 (Rev. 04/10) Application for a Search Warrant

Authorized and Approved Date: s/Nick Coffey 01/04/2024

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| THE CELLULAR DEVICE ASSIGNED CALL NUMBER (405) 979-3650 WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER 310410388629674 IN THE CUSTODY OR CONTROL OF AT&T | ) ) ) ) |

Case No.  M-24- 8    -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ___ Southern ___ District of ___ Florida ___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Distribution and Possession of CS with Intent to Distribute; Drug Conspiracy |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Adams, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __Jan 4, 2024__

City and state: ██████████ __Lawton, OK__

_____
*Judge's signature*

SHON T. ERWIN, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (405) 979-3650 WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER 310410388629674 IN THE CUSTODY OR CONTROL OF AT&T** | **Case No.** MJ-24-8-STE<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, **Michael Adams**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned with call number **(405) 979-3650** (the "**Subject Account**") that is in the custody or control of AT&T, a wireless communications service provider that accepts process at 11760 U.S. Highway 1 North Palm Beach, Florida 33408. As a provider of wireless communications service, **AT&T** is a provider of "electronic communications service," as defined in 18 U.S.C. § 2510(15).

2.     The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require **AT&T** to disclose to the government the information further described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**,

government-authorized persons will review the information to locate the items described in Section II of **Attachment B**.

3.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definition of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute, including a certification from an attorney for the government that the information likely to be obtained by the requested pen register and trap-and-trace device is relevant to an ongoing criminal investigation. *See* 18 U.S.C. § 3123(b)(1).  That certification is attached as **Attachment C**.

4.      In sum, this affidavit is made in support of an application for three distinct items: (1) a pen register and trap-and-trace device on the **Subject Account**, pursuant to 18 U.S.C. § 3121–3127; (2) a "ping" on the **Subject Account**, pursuant to 18 U.S.C. § 2703 and Fed. R. Crim. P. 41(c); and (3) an order for prospective cell site data for the **Subject Account**, pursuant to 18 U.S.C. § 2703(d).

5.      I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been a Special Agent with the Federal Bureau of Investigation (FBI) (the "**Investigating Agency**") since March 2015.  As a Special Agent, I have participated in and conducted investigations involving violations of federal criminal laws to include the

distribution of and conspiracy to distribute controlled substances. I am familiar with the investigative techniques used in these investigations such as the use of undercover agents, the use of cooperating source(s), the analysis of telephone tolls and pen register information, search and seizure warrants, Grand Jury investigations, and the interception of wire and electronic communication. In this capacity, my responsibilities include the investigation of possible violations of federal law. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 (the "**Target Offense(s)**") have been committed by **Adrian Perez** (**PEREZ**) and other known and unknown co-conspirators. There is also probable cause to search the information described in **Attachment A** to assist and aid in the location of **PEREZ** as further described in **Attachment B**.

8.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. §§ 2711 & 3127. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. §§ 2711(3)(A)(i) & 3127(2)(A)(i).

**PROBABLE CAUSE**

9.    Law enforcement first became aware of Oscar Hernandez (OSCAR) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond.  During the investigation, which utilized Title III wiretaps, law enforcement intercepted OSCAR and identified him as one of the IMG's principal sources of supply of methamphetamine.  These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP.  Next, from roughly 2019 to 2021, law enforcement began targeting OSCAR's distribution network.  During that portion of the investigation (Phase 1), investigators uncovered a massive methamphetamine distribution network led by OSCAR.

10.    Phase 1 established that OSCAR, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at OSCAR's direction.   The investigation established that the methamphetamine was being transported in the gas tanks of a semi-truck, which was owned by and registered to a company called DGC Express.  DGC Express, in turn, listed its registered agent as Nelly Gutierrez (NELLY), according to the Texas office of the comptroller.  Once the semi-truck arrived in Oklahoma, it was received by lab workers at a private location, where the liquid methamphetamine was extracted, placed into transportable containers, and taken to the clandestine lab location for conversion, after which the crystal meth was returned to Oklahoma City for distribution.

11.    As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including OSCAR (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, *and United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted OSCAR's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)[1]—that law enforcement launched the second phase (Phase 2) of the investigation into the DTO.

---

[1]    CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

12.     Since Phase 2 of the investigation, **PEREZ** and Ray David Lara (LARA) have been identified as key members of the DTO working in and around Oklahoma City.

13.     On October 20, 2023, United States District Judge Scott L. Palk for the Western District of Oklahoma, issued an order—the Government's application for which named LARA, **PEREZ**, and OSCAR as "Target Subjects"—authorizing the continued monitoring and recording of visual, non-verbal conduct inside the DTO's warehouse located at 701 SE 29th St., Oklahoma City, Oklahoma (hereinafter, the "warehouse"), which the investigation had established the DTO was using to discreetly extract liquid methamphetamine from the gas tank of a semi-truck.

14.     On November 10, 2023, pursuant to the authorization described above, law enforcement was able to record a shipment of liquid meth being delivered to the warehouse in which LARA and **PEREZ** were present. That day, two of the DTO's conversion lab workers—Edgar Rodriguez Ontiveros (RODRIGUEZ) and Jose Equihua (EQUIHUA)—were the first to arrive at the warehouse, at approximately 7:18 a.m. Shortly after arriving, RODRIGUEZ appeared to inspect a large, white, intermediate bulk container with metal caging around it (hereinafter, the "IBC tank").

15.     At approximately 8:15 a.m., EQUIHUA opened the middle garage bay door, and a black semi-truck, with Michael Estrada (ESTRADA) driving, arrived at the warehouse and pulled into the middle garage bay, with the door closing behind it. RODRIGUEZ then moved the IBC tank to a position adjacent to the black semi-truck's passenger-side fuel tank(s). The two lab workers, using two pumps and two sets of hoses, appeared to extract liquid meth from the fuel tank into the IBC tank. The pair finished at

approximately 8:32 a.m., and ESTRADA then departed with the black semi-truck.  Four

minutes later, at approximately 8:36 a.m., LARA arrived at the warehouse driving a white

Dodge pickup truck, which was towing a black pull-behind trailer.  **PEREZ** also arrived

shortly after on foot.  For the next hour or so, the two lab workers, LARA, and **PEREZ**

worked to load the IBC tank inside the black pull-behind trailer.  The group also loaded

propane tanks and what appeared to be containers of a chemical substance, such as

acetone—both of which I know based on my training and experience are commonly used

to convert liquid methamphetamine to crystal form.

  16. The lab workers, driving a red pickup truck, ultimately departed the

warehouse at approximately 9:54 a.m., and **PEREZ**, driving the white Dodge pickup truck

and the black pull-behind trailer departed shortly thereafter.  The pair then arrived in

tandem to 980801 S Stage Coach Drive, Wellston, Oklahoma—a location law enforcement

has confirmed was serving as the DTO's a clandestine meth lab (hereafter referred to as

the "Wellston lab").

  17. A cooperating defendant (CD1)[2] with knowledge of the Wellston lab told

law enforcement that **PEREZ** was involved in the receipt and transport of liquid of

---

[2] CD1 began cooperating with law enforcement in 2023.  CD1 has previously been
arrested for domestic assault and battery (2015), burglary (2016), assault with a dangerous
weapon (2016), and drug trafficking crimes (2023).  CD1 has furnished information to law
enforcement in hopes of receiving consideration for his/her most recent pending charges.
CD1 has not received any monetary compensation to date for his/her cooperation.  The
information provided by CD1 has been corroborated through other investigative
techniques, including physical surveillance, telephone analysis, etc.  Information provided
by CD1 has been reliable, and I am unaware of any knowingly false information furnished
by CD1.  Information herein attributed to CD1, unless otherwise noted, was obtained by

methamphetamine on behalf of this DTO.  CD1 also told law enforcement that **PEREZ** used the **Subject Account**. Law enforcement has confirmed that **PEREZ** appears to still be using the **Subject Account**, as it is one of the top callers for (405) 551-5113—a phone used by **PEREZ's** partner, LARA.

18.     On November 20, 2023, law enforcement initially applied for, and received authorization for, the information sought herein associated to the **Subject Account**.[4] Since this authorization, the prospective location information received has been invaluable to law enforcement's investigation. For example, on November 29, 2023, law enforcement was tracking the DTO's transportation of meth between the Wellston lab and a car wash business that LARA owns, located at 221 SW 29th St., Oklahoma City.  On this date, the surveillance cameras placed at both locations indicated to law enforcement that a shipment was being transported. Moreover, the location information on the **Subject Account** placed

---

CD1 through his/her personal observations or conversations with targets of this investigation and their associates.

[3]     Law enforcement currently has a pen register trap and trace device installed on this phone number. This phone number was listed on the signage advertising a business LARA owns—Demetrio's Car Wash LLC. Also, the subscriber information, according to AT&T, lists LARA's sister, Patricia Macias, as the financial liable party. I know based on training and experience that drug dealers often do not register phones in their own name, rather they use either fictitious names, or have other individuals register them in their name—which is what appears to be happening here.

[4]     *See* Case No. M-23-952-SM.

**PEREZ** in the area of the Wellston lab, suggesting to law enforcement he was involved in the delivery.[5]

19.     Law enforcement conducted a search warrant at the Wellston lab on December 8, 2023. During this search warrant law enforcement recovered hundreds of pounds of liquid and crystal methamphetamine, and EQUIHUA and RODRIGUEZ were both arrested. This did not, however, appear to stop the DTO's activities. In fact, on December 17, 2023, the same black semi-truck with ESTRADA again driving returned to the Oklahoma City metro area. Based on location information on ESTRADA's phone and LARA's phone, it appears that ESTRADA and **LARA** met somewhere east of Oklahoma City at an unknown location. Although, **PEREZ** did not appear to be directly involved in this exchange, **PEREZ** has routinely, and as recently as January 3, 2024, been observed with LARA at his car wash—a central location for the DTO.

20.     The investigation into LARA, **PEREZ**, and the DTO is ongoing, and location information on the **Subject Account** will undoubtedly aid law enforcement in confirming new locations and associates related to the DTO including a potentially new conversion lab and any associated workers.

---

[5]     **PEREZ** rarely, if ever, goes all the way to the Wellston lab where he would be captured on surveillance camera. Rather, **PEREZ** appears to meet RODRIGUEZ and/or EQUIHUA in the vicinity of the Wellston lab in order to make the transfer before transporting the meth back to the car wash.

21.      Through administrative subpoenas, I have confirmed that AT&T continues to provide service for the **Subject Account**, for which "Dish Wireless LLC"[6] with the address of 9601 S Meridian Blvd, Englewood, CO 80112, is listed as the Billing Party.

22.      In my training and experience, I have learned that AT&T is a company that provides cellular communications service to the general public.  I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call to or from that device.  Accordingly, cell-site data provides an approximate general location of the cellular device.

23.      Based on my training and experience, I know that AT&T can collect cell-site data about the **Subject Account**.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the

---

[6]      Dish Wireless appears to be a wireless network provider that uses AT&T's network.

communication; (4) the cell tower to which the customer connected at the end of the communication; (5) the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data; and (6) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

24.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

25.    Based on my training and experience, I know wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card

account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may assist in locating **PEREZ**.  In my training and experience, this information may also constitute evidence of the crimes under investigation because the information can be used to identify the **Subject Account**'s user or users and may assist in the identification of co-conspirators.

26.    Based on my training and experience, the combination of both historical and prospective location information is helpful in locating individuals.  The historical location information from cellular phones can help establish a pattern of life, while prospective location information—including cell-site information, phone pings, and timing advance measurements/distance-to-tower measurements—can help provide more precise real-time information regarding the location of the **Subject Account's** user.  To help ensure that **PEREZ** is located to assist in surveillance operations furthering the investigation into **PEREZ**, I am requesting precise location information for the next forty-five (45) days for the **Subject Account**.

## AUTHORIZATION REQUEST

27.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.  The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain

information in **Attachment A** for each communication to or from the **Subject Account**, without geographic limit, for a period of forty-five (45) days pursuant to 18 U.S.C. § 3123(c)(1).

28.     I further request, pursuant to 18 U.S.C. § 2703(b)(1)(A), that the Court find that the government is not required to provide notice of this warrant to the subscriber, customer, or person who was monitored.  I also request, pursuant to 18 U.S.C. § 3123(d), that AT&T be ordered not to disclose to the listed customer or any other person the existence and/or use of the pen register and trap-and-trace device sought herein.  Additionally, there is reasonable cause to believe that providing immediate notification of the warrant to the subscriber, customer, or person who is being monitored may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber, customer, or user of the **Subject Account** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 2705(a)(2).  Therefore, I request that the Court order AT&T not to notify any other person of the existence of this warrant and order for a period of one year from the date the requested warrant is issued, except that the service provider may disclose this warrant and order to an attorney for the service provider for the purpose of receiving legal advice.  As further specified in **Attachment B**, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or

any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

29.    I further request that the Court direct AT&T to disclose to the government any information described in Section I of **Attachment B** that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

30.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for a period of one year from the date the requested warrant is issued, or until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents as their premature disclosure may jeopardize this investigation.

Respectfully submitted,

MICHAEL ADAMS
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____Jan. 4_____, 2024

SHON T. ERWIN
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Property to Be Searched

1. The cellular telephone assigned call number (405) 979-3650 with International Mobile Subscriber Identity / Electronic Serial Number 310410388629674 (the "**Subject Account**") whose wireless service provider is AT&T (the "Provider"), a company that accepts process at 11760 U.S. Highway 1 North Palm Beach, Florida 33408.

2. Records and information associated with the **Subject Account** that is within the possession, custody, or control of the Provider.

## **ATTACHMENT B**

## **Particular Things to Be Seized**

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **Subject Account** listed in **Attachment A**:

1.

a.    The following information about the customers or subscribers associated with the **Subject Account** for a period of 45 days from the issuance of the warrant, including:

i.    Names (including subscriber names, user names, and screen names);

ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.    Local and long-distance telephone connection records;

iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.    Length of service (including start date) and types of service utilized;

vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network

Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.    Prospective information about the location of the cellular phone associated with the **Subject Account** for a period of 45 days (during all times of day and night) from the issuance of the warrant, including:

i.    E-911 Phase II data;

ii.    GPS data to include cell tower sector information;

iii.    Latitude-longitude data;

iv.    Other precise location information, including engineering data to include but not limited to RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

v.    Pen Register / Trap and Trace device with prospective cell site information or data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **Subject Account** during any voice, SMS, and/or data transmission, including but not limited to engineering data which would include RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records.

## II.    Information to Be Seized by the Government

All information described above in Section I that would assist and aid in locating any evidence of violations of Target Offenses.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T in order to locate the things particularly described in this Warrant.

## ATTACHMENT C

### 18 U.S.C. § 3122 Certification

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subject(s) for violation(s) of the Target Offense(s).

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

01/04/2024
DATE

Nick Coffey
Assistant United States Attorney